Fulton County Superior Court
***EFILED***if
Date: 6/13/2023 10:54 AM
Cathelene Robinson, Clerk

IN THE SUPERIOR OF FULTON COUNTY
STATE OF GEORGIA

2023CV381348

CIVIL ACTION NO:

JOHN DOE,
On behalf of himself and all
Others similarly situated,

Plaintiff,

**CLASS REPRESENTATION**
COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

vs.

VGW MALTA LTD, and
VGW LUCKYLAND, INC.,

Defendants.

/

## COMPLAINT

Plaintiff JOHN DOE brings this action on behalf of himself and all others similarly

situated individuals against Defendants VGW Malta Ltd. and VGW LuckyLand, Inc.

(collectively "VGW" or "Defendants").

## INTRODUCTION

1.      Defendants own and operate what they claim is a video game development company and

"social casino." In reality, Defendants have created, own, and operate popular virtual casinos,

including virtual casino games under the names "Chumba Casino" ("Chumba") and LuckyLand

Slots ("LuckyLand") (hereafter, also collectively referred to as "the games" or "casino games").

2.      In these casino games Defendants offer a multitude of electronic versions of slot

machines, blackjack, and at all times material to this action roulette or a form of a lottery wheel.

The games are available to play online at chumbacasino.com and LuckyLandslots.com.

3.    Defendants have represented to the public and to various financial institutions, such as banks and credit card processing companies, that Defendants operate video game or arcade game websites permitting just for fun gameplay. However, in reality the Defendants have intended to and actually operate websites that are internet gambling casinos where customers and consumers wager and lose real money, by in some sense attempting to camouflage the key components of their operations as "sweepstakes."

4.    Initially, in exchange for "real money" from consumers, Defendants sell virtual currency, or "coins" that can be used to wager on games of chance for fun. However, Defendants have established a scheme to deprive consumers of money by providing consumers the potential to win real money prizes. Defendants use these coins to both give consumers a false sense of security, while hiding that Defendants are engaging in real money gambling, and misleading regulators about the true nature of Defendants' businesses.

5.    In fact, this has been the intent and plan of Defendants for over a decade. As early as 2012, the billionaire founder/CEO of the Defendants, Laurence Escalante, expressed his intent to create virtual gambling casinos that would offer consumers the opportunity to gamble online with "real money" outside the United States, and at that time purportedly within the United States with "virtual currency." This was stated by the founder of Defendants during a televised or recorded conference at the "Launch Festival, March 7 and 8, 2012, at the San Francisco Design Center." A video presentation of this expressed intent can be found at https://www.youtube.com/watch?v=M-ekhp92V-0&list=PPSV. The founder and Defendants from 2012 through the present have advertised that they look to combine "virtual currency and gambling".

6.    For several years Defendants have targeted and operated an online real money gambling casino within Georgia, a large market known for having extensive restrictions regarding gambling. In Georgia, as with other states, Defendants entice visitors to play on their sites by offering a "free-to-play" option where players receive a bundle of free "coins" to play their casino games, and where every game is a game of chance. After the customers inevitably lose these coins, they are prompted to purchase more if they wish to continue playing.

7.    Freshly topped off with additional coins, consumers wager to win more coins. The coins won by consumers playing Defendants' games of chance are identical to the coins that Defendants sell. Thus, by wagering coins that were purchased, consumers have the chance to win additional coins that they would otherwise have to purchase.

8.    None of the coins titled "Gold Coins" may be redeemed for real money. However, through this process, the consumer expends money to play casino games for the experience of the game and the experience of games of chance or gambling. The exclusive purpose of selling consumers the "Gold Coins" is to cause consumers to play the Defendants' games of chance. It is very difficult for consumers to play Defendants' games without purchasing "Gold Coins" and impossible to play any of the games without maintaining a balance of coins that the consumer can wager.

9.    When consumers purchase "Gold Coins," Defendants provide an additional ration of special coins ("Sweeps Coins") that consumers can use to play the games and win or lose real money.

10.    This casino scheme has been wildly profitable for VGW as a whole, and in the 6 months ended December 31, 2022, alone Defendants profited 249 million dollars. *Virtual Gaming Worlds LAUNCHES $251m buyback, no sign of IPO, March 21, 2023, Australian Financial*

*Review, www.afr.com.* However, by operating their virtual casinos the Defendants have violated Georgia law and have been taking advantage of Georgia consumers to the tune of multi millions of dollars.

## JURISDICTION AND VENUE

11.     This court has jurisdiction over the subject matter of this action because it is a court of general jurisdiction and the damages sought by Plaintiff and the Class far exceed the maximum dollar amount for jurisdiction in a lower court.

12.     This court has personal jurisdiction over Defendants pursuant to Title 9, Chapter 10, Article 4, Section 9-10-91 of the Official Code of Georgia Annotated, (O.C.G.A.) because: Defendants operated, conducted, engaged in or carried on a business in Georgia, Defendants contracted to provide services or goods to citizens in this state, and Defendants committed tortious acts within the state of Georgia, causing Plaintiff and the Class to suffer damages.

13.     Venue is proper in this county pursuant to Section 9-10-93 of the O.C.G.A., because a substantial part of the events giving rise to the claims asserted herein occurred in Fulton County and because Defendants committed acts that are the basis of this lawsuit in Fulton County.

## PARTIES

14.     Plaintiff made multiple purchases of Gold Coins in both Defendants websites this month and within the time frames under the statute of limitations in Georgia. In total Plaintiff lost approximately $1,000 playing the games.

15.     Plaintiff has filed this case in the pseudonym of "JOHN DOE" in order to protect his privacy, as permitted by Georgia law. Due in part that the facts and circumstances of this case,

reveal that Plaintiff is now aware that he may have unknowingly participated in illegal gambling by playing Defendants games, potentially in violation of Section 13-8-3 of the O.C.G.A.

16.    Defendant VGW Malta Ltd. is an unlisted Australian public company with a registered address in Malta. VGW Malta Limited also maintains offices in Australia. VGW Malta Limited conducts business throughout this county, the state of Georgia and the United States of America.

17.    Defendant VGW LuckyLand, Inc. is a Delaware corporation. VGW LuckyLand, Inc. also maintains an office in San Francisco California.  VGW LuckyLand, Inc. conducts business throughout this county, the state of Georgia and the United States of America.

## FACTUAL ALLEGATIONS

**Free-to-Play, the New Era of Online Gambling and Relation to VGW**

18.    Defendants utilize the so-called "free-to-play" business model with the goal of manipulating consumers and enticing them to spend real money on casino games of chance, based on the hope of winning real money.

19.    "Free-to-play" video games have experienced immense growth thanks to the proliferation of internet-connected mobile devices.  Free-to-play games developers encourage consumers to download and play games for free while selling many low-cost items within the game itself. Developers need to recoup their cost and make a profit by selling thousands of "in-game" items. In many cases starting as low as $0.99 (purchases known as micro-transactions") instead of charging an up-front fee.

20.    The free-to-play model is a proven method whereby developers can generate huge profits and thus the model has become particularly attractive to developers of games of chance (e.g., slot machine mobile video games and online automated blackjack).

21.    Free-to-play games of chance developers eventually decided to exploit the same

psychological triggers used by brick-and-mortar casinos. As one respected video game

publication put it:

> ...If you hand someone a closed box full of promised goodies, many will happily
> pay you for the crowbar to crack it open. The tremendous power of small random
> packs of goodies has long been known to the creators of physical collectible card
> games and companies that made football stickers a decade ago. For some... the
> allure of a closed box full of goodies is too powerful to resist. Whatever the worth
> of the randomised [sic] prizes inside, the offer of a free chest and the option to
> buy a key will make a small fortune out of these personalities. For those that like
> to gamble, these crates often offer a small chance of an ultra-rare item. ...

PC Gamer, *Microtransactions: the good, the bad and the ugly,*
http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited April 5,
2023)

22.    Another respected video game magazine, *Game Informer*, reported on the rise and

danger of microtransactions, free plug to play games and the similarity to the business model of

casinos and concluded:

> ...[M]any new mobile and social titles target small, susceptible populations for
> large percentages of the revenues. If ninety-five people all play a [free to play]
> games without spending money, but five people each pour $100 or more in to
> obtain virtual currency, the designer can break even. These five individuals are
> what the industry calls whales, and we tend not to be concerned with how they're
> being used in the equation. While the scale and potential financial ruin is of a
> different magnitude, a similar profitability model governs casino gambling. ...

Game Informer, *How Microtransactions Are Bad For Gaming – Features –
www.Gameinformer.com,* https://www.gameinformer.com/b/features/archive/2012/09/12how-
microtransactions-are-bad-for-gaming.aspx (last visited April 5, 2023)

23.    Academics have also studied the socioeconomic effect that free-to-play games have on

consumers. In one study, the authors compiled several sources analyzing "free-to-play" games

of chance (called "casino" games below) and stated that:

> ...[Researchers] found that [free-to-play] casino gamers share many similar
> sociodemographic characteristics (e.g., employment, education, income) with
> online gamblers. Given these similarities it is perhaps not surprising that a strong

predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling....

According to [another study] the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1-5% of [free-to-play] casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60% of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits. ...

Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (last visited April 5, 2023)

24.    The same authors looked at the link between playing free-to-play games of chance and gambling casinos. They stated that "...prior research indicated that winning large sums of virtual credits on social gaming sites was a key reason for [consumers] migration to online gambling. ... ." The largest prediction that a consumer will transition to online gambling was "microtransaction engagement." In fact, "...the odds of migration to online gambling were approximately eight times greater among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions. ..."

25.    The Defendants thus exploit these well-established tendencies to manipulate consumers to transition from playing the free game play to spend dollars on coins used for real money gambling.

**Defendants' Games**

26.    Defendants operate two popular casino-oriented Internet games. These are Chumba Casino and LuckyLand Slots. Both operate in much the same way, and therefore the causes of action alleged in this complaint are identical for both Defendants.

27.    As alleged above, when consumers visit the Defendants' websites and games for the first-time consumers are awarded an allocation of "free" coins. Consumers are offered two different types of coins "Gold Coins" (hereafter also referred to as "GC") and "Sweeps Coins" (hereafter also referred to as "SC") (together, the "coins").

28.    Consumers also receive coins as a free daily bonus once a day when logging in to their account. An example of the popup message for this "Daily Bonus" is below:



29.    Consumers can play games on the platform in "standard mode" or "standard play" using GC or play in "promotional mode" or "promotional play" using SC. Consumers may switch

between these two modes easily and as frequently as they would like. An example of the toggle button permitting this switching is shown below:



30.     It is important to note that it is only possible to play the Defendants' games through the wagering of either GC or SC. It is impossible for a consumer to play the Defendants' games when the consumer does not have a balance of coins in account with Defendants.

31.     When consumers play in "standard mode" or "standard play" they can win or lose GC. Routinely, after they begin playing, consumers quickly lose their allotments of GC. This is because the consumer is playing games of chance that are skewed heavily in the favor of the Defendants – just like in brick-and-mortar casinos. Furthermore, as with brick-and-mortar casinos, the longer a consumer plays Defendants' games the more likely Defendants will ultimately win and the consumer will exhaust the coins.

32.     Immediately after the GC are exhausted, when consumers attempt to continue playing, Defendants inform the consumers that they have insufficient coins to place a wager – preventing them from continuing to play the game. On Chumba Casino users are presented with the below message instructing them to purchase more GC to keep playing:



33.     Upon clicking "Buy Gold Coins" consumers are redirected to the "Store" where they can purchase more GC.  On Chumba, the majority of the purchase packages also offer SC as part of the purchase of GC. The SC are prominently highlighted by the Defendants in green, likely intended to symbolize the color of money.  Shown below is an example of the Chumba Store message.



34.    In LuckyLand Slots users are directed to the "LuckyLand Store" to purchase more GC and every purchase package provides SC, which are likewise prominently displayed in green. An example of that message is below:



35.     The aforementioned process is identical for "promotional play" in "promotional mode" where consumers are wagering SC. The consumer will use their SC to play casino games and, upon no longer having sufficient SC to wager, they will be redirected to the store to purchase more coins. They are shown the exact same messages as depicted above and consumers are instructed that by purchasing a package of GC, they will simultaneously be purchasing SC to continue playing.

36.     Regardless of which mode the consumer is using for playing, the consumer must purchase additional coins if the consumer wishes to continue playing. Consumers are presented with options to purchase additional GC and purchase packages can vary. However, for Chumba generally prices may range from $1.00 for 200,000 GC to $1,000 packages for 400,000,000 GC; for LuckyLand from $9.99 for 40,000 GC to $299.99 for 2,100,000 GC. The amount of SC provided to the consumer can vary, but it tends to be approximately a 1:1 ratio to the "real

money" purchase price the consumer pays, with some extra SC given when the consumer purchases greater quantities of GC.

37.    Armed with their new Gold Coins, consumers can resume playing Defendants' games. If the consumer wins GC, the consumer can use the GC to continue playing the games for fun. Inevitably consumers eventually lose their entire GC balance and must spend more money to continue playing the games.  However, the playing of the games for fun is not sufficient for Defendants' business and profit.  Therefore, Defendants advertise and promote the ability of consumers to receive SC when the consumers purchase additional GC.

38.    The process is the same for playing with Sweeps Coins (SC). The only difference being that Sweeps Coins can be redeemed for cash or real money with an exchange rate of one SC equal to one dollar.

39.    The overall gameplay and the method for getting consumers to play Defendants' games partly reveals how Defendants use "free-to-play" gaming to manipulate the consumer into spending, gambling and losing real money, not simply "virtual currency" that the Defendants' founder, Laurence Escalante, described in 2012.

40.    In addition, Defendants sometimes offer free coins to entice consumers to play their casino games.  And, as has been scientifically recognized, the casino games can become addicting since casino games have been scientifically proven to stimulate dopamine boosts in human beings. Consumers inevitably quickly lose these free coins. Defendants then stimulate consumers to purchase more coins necessary to play by redirecting the consumers to the store after losing the free coins. This applies for both types of coins (GC and SC) that Defendants offer.

41.     Defendants may erroneously claim that GC have "no monetary value." However, consumers cannot play the games in standard mode without GC. This is their value. This is different from more traditional free-to-play games, such as the popular video game "Fortnite" where consumers can always play the game without making purchases. Any purchases on the video games such as "Fortnite" are simply to enhance the video game experience. Whereas, the coins in the Defendants' games are the be-all and end-all. Furthermore, the Defendants themselves are placing a price on the GC in dollars, especially with the award of SC, thus giving them a monetary value.

42.     This becomes clearer with a concrete example. A consumer purchases 5,000,000 GC for $20.00 in Chumba. This purchase package values 100,000 GC for $0.40. The consumer wagers 100,000 GC on a pull of the slot machine or on a roulette wheel. The consumer is lucky and wins 500,000 GC to continue playing the game. In other words, absent this win the 500,000 GC would have cost the consumer approximately $2.00 to purchase. Put another way, when consumers wager GC they are exclusively wagering to win more GC to continue playing – and therefore are winning a savings of dollars that the consumer does not have to otherwise spend. Consequently, this wagering of GC is gambling.

43.     Moreover, with the gambling of SC in promotional mode, the real money gambling is extremely clear. This is where Defendants make the lions" share of their profits through exploitation of the consumer.

44.     Defendants may claim that, "...Sweeps coins cannot be purchased and [have] no inherent value. ..." *https://www.chumbacasino.com/about-us*.  However, this is extremely disingenuous as the GC purchase packages prominently display the amount of SC the consumer receives, and the SC can be redeemed directly to consumers bank accounts, where one SC is equal to one dollar.

It is no mistake that at the time of purchase of GC, the amount of SC available to the consumer is nearly one to one for the dollars that the consumer spends. When a consumer plays SC and has a balance the redemption button is prominently displayed on Defendants' websites clearly identifying that the consumer can redeem the SC for cash or cash equivalent gift cards. Below are images showing the redemption process on Chumba Casino:









**CHUMBA CASINO**

**Sweepstakes Cash Prize Redemption**

How many Sweeps Coins would you like to redeem?

SC                                                    0.10
                                                   available
SC100.00 Minimum

The redeemed value of your sweepstakes prize will be        $0.00 USD

| Go Back | Next |
|---------|------|

45.     Defendants incentivize consumers to continue playing their games, and eventually lose their SC balance by making it difficult for consumers to redeem and collect SC. The minimum permitted redemption amount is 100 SC to be redeemed for $100. Therefore, any balance below 100 SC remains stuck on the site, a further encouragement for consumers to continue playing the games. The Defendants also permit only one redemption per time, and Defendants have implemented delays to "approve" and "process" redemptions. These restrictions are designed to further entice consumers to cancel their redemption requests and continue playing the casino games. These techniques or restrictions are not permitted at brick-and-mortar casinos that are highly regulated by the states.

46.     The Defendants use the previously described "free-to-play" model to entice consumers to play their games of chance which are indistinguishable from brick-and-mortar casino games, which are now dominated by video type gambling machines, ranging from blackjack, roulette, and through slots. Defendants hook consumers further by stimulating their purchases of GC

John Doe Complaint                     17

packages. Defendants then prominently display and highlight the SC (shown in the previously included store images) that the consumer receives by purchasing GC packages. Once the consumer becomes aware that SC may be redeemed for real cash the transition is complete and Defendants have manipulated the consumer into real money gambling that the consumer experiences without having to travel to a brick-and-mortar casino.

47.     Consumers can accumulate SC in multiple ways:

   a. By receiving SC upon the purchase of specifically marked packs of Gold
   Coins;

   b. By entering "Sweeps Coins no-cost give away contests" on the games'
   Facebook pages;

   c. By sending a request by mail to Defendants; and,

   d. As a "Daily Bonus" given when logging on to the players account (once per
   day). *https://www.chumbacasino.com/sweeps-rules*.

Consumers, however, are highly incentivized towards option "a." This is because the other options vary from very difficult and slow (taking months to write, send letters and receive credits for sending a mail request) to very small (only receiving one SC per day from the "Daily Bonus").

48.     Players can play the same casino games using SC that they would play with GC. The significant difference is that when a consumer plays the casino games with GC, a consumer or player can only win or lose GC, whose value exists solely in allowing the consumers to play the games without continuing to disburse more cash. Whereas, as previously mentioned, SC are available to be redeemed for dollars in consumers' bank accounts.

John Doe Complaint                                18

49.    Defendants have thus devised a scheme whereby players can utilize SC in a manner indistinguishable from a brick-and-mortar casino, but where Defendants have misled Georgia consumers into mistakenly believing that they are playing games that are permitted by Georgia law.

50.    In most instances, the consumer receives an amount of SC that is slightly greater than the dollar amounts the consumers deposit. The larger the purchase package the more SC the consumer receives. For example, a purchase package that costs $5.00 will come with 5.05 SC, a difference of 1%. But a package that costs $300 for GC comes with 315 SC, a difference of 5%. Defendants reward the players who purchase more expensive packages with more extra SC, thus stimulating more purchases and more play. This is no different than a brick-and-mortar casino that offers players extra chips/free play, free drinks, free food, free rooms, etc. to incentivize them to play more – and inevitably lose more money.

51.    Consumers are required to wager their SC before they are permitted to redeem said SC. Defendants claim that this is how they remain "legal." Defendants claim the SC are unable to be redeemed before wagering, and therefore have no value. Only after wagering SC and, in the unlikely scenario that consumers win the wager, the SC that are won have monetary value and can be redeemed. In Defendants' own words, the SC "...that has been won through game play (rather than collected using one of the methods described in paragraph 47, above) can then be redeemed for a prize with a value equal to US $1.00 per SC." This is the Defendants' way to force consumers to wager and lose money. In other words, players, consumers, or customers are required to play the games of chance or gamble on Defendants' site with SC in order to later redeem the SC and collect a prize, including money. *https://www.chumbacasino.com/sweeps-rules*.

52.     Accumulation of SC by players may provide an incentive for them to purchase GC, however, winning any actual money through accumulating Sweeps Coins (SC) is often a pipe dream because these games of chance are not subject to regulation in the United States (Defendants claim to be regulated in Malta), and the games certainly heavily favor the Defendants.

53.     Regardless of what mode a player is using, in both Defendants' websites once the player or consumer spins the slot machine by pressing a button none of Defendants' slot machine games allow (or call for) any additional user action. Instead, the consumer's device communicates and sends information to Defendants' servers. Defendants' servers then execute the games' algorithms that determine the spin's outcome.

54.     None of the outcomes in Defendants' slot machine games depend on any amount of skill to determine their outcomes – as all outcomes are based entirely on chance.

55.     In Defendant Chumba's blackjack games, the player makes choices and wager coins in a manner identical or nearly identical to placing bets at a casino blackjack table, although the chances of winning are unknown because of the lack of transparency regarding the algorithms employed by Defendants.

56.     Defendants maintain win and loss records and account balances for each consumer. Indeed, once Defendants' algorithms determine the outcome of a wager, Defendants display the outcome to the consumer, Defendants then adjust that consumers account balance. Defendants keep records of each wager, outcome, win, and the loss for every player of the games.

57.     Additional evidence of the fact that Defendants are operating internet gambling sites is the fact that consumers can only obtain SC through purchasing GC or using the other methods described in paragraph 47, above. For example, in Chumba when a consumer purchases

150,000,000 GC at a cost of $300.00 "real money", the consumer receives 315 SC. However, if the consumer plays the casino game, wagers all 150,000,000 GC and wins an additional 150,000,000 GC, the consumer receives no any additional SC. So, the Defendants restrict consumers requiring them to purchase more and more GC, at the same time enticing the consumers with the hope that by purchasing huge quantities of GC, the consumer can increase his or her supply of SC. This often results in the consumer playing the games with just SC because by wagering only SC, the consumer can win "real money" that can be used to purchase more GC and SC.

58.    Defendants may claim that they award SC to consumers like sweepstakes prizes. In reality, however, consumers must either purchase SC or otherwise provide some monetary consideration to obtain SC, whether in the form of direct purchases of SC, purchases of GC, or the costs of preparing and mailing in requests to Defendants. Any other methods of obtaining SC result in the award of only nominal amounts of SC. In other words, as in the case of brick-and-mortar casinos, consumers are only able to obtain SC in much the same manner as a customer purchasing chips at a brick-and-mortar casino. Likewise, except for direct purchases of SC, Defendants can and do arbitrarily limit the bonuses of SC upon purchases of GC and Defendants often arbitrarily reject submissions of mailed requests for SC, contrary to the normal the sweepstakes process.

59.    Contrary to Georgia law, Defendants are operating virtual casinos within the state of Georgia, and Defendants have misrepresented to Georgia consumers that the consumers are participating in games that are permitted by Georgia law, when in reality the consumers are actually gambling, as defined by Georgia law.

John Doe Complaint                              21

## CLASS REPRESENTATION ALLEGATIONS

60.     Plaintiff seeks to represent a class defined as all individuals who in the state of Georgia suffered losses of money on Chumba Casino or LuckyLand Slots during the applicable limitations period (the "Class").

61.     Specifically excluded from the Class are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with the Defendants and or Defendants' officers and or directors, the judge assigned to this action, and any member of the judge's immediate family.

62.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

63.     **Numerosity**:  On information and belief tens of thousands of consumers fall into the definition of the Class. Members of the class can be identified through Defendants' records discovery and other third-party sources.

64.     **Commonality and Predominance**:  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. The common legal and factual questions include, but are not limited to, the following:

        (a)   Whether Plaintiff and Class Members play on all of Defendants' virtual casino games constitute gambling under Georgia law;

(b)   Whether Plaintiff and the Class lost money gambling to Defendants as defined by Section 13-8-3 of the O.C.G.A.; and,

(c)   Whether Plaintiff and the Class are entitled to recover their monies spent on Defendants' casino games pursuant to Section 13-8-3 of the O.C.G.A..

65.    **Typicality**:  Plaintiffs claims are typical of the claims of the other members of the Class and that among the other things all Class members were similarly situated and were comparably damaged through Defendants' wrongful conduct as set forth herein.  The claims of all Class members are similar in that they all lost money playing the games owned by Defendants.  Further there are no defenses available to Defendants that are unique to Plaintiff.

66.    **Adequacy of Representation**:  Plaintiff will fairly and adequately protect the interests of the Class, which is estimated to consist of ten thousand to one hundred thousand Georgia residents.  Plaintiff has retained counsel that has more than 25 years litigation experience and Plaintiff intends to vigorously prosecute the action on behalf of the Class.  Furthermore, Plaintiff has no interest that are antagonistic to those of the class.

67.    **Superiority**:  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriments suffered by individual Class members are relatively small compared to the burden and expense of individual litigation on their claims against Defendants.  It would thus be virtually impossible for the Class to obtain effective redress for the wrongs committed against the members on an individual basis.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by the action.  By

contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF SECTION 13-8-3 OF THE O.C.G.A.

68.    Plaintiff incorporates the foregoing allegations of paragraphs 1-67 as if fully set forth herein and sues Defendants for violations under Section 13-8-3 of the O.C.G.A.

69.    Further, Section 13-8-3 of the O.C.G.A. specifically declares that all gambling agreements and contracts are void and of no effect.

70.    Specifically, Section 13-8-3 states:

**§ 13-8-3. Gambling contracts**

(a) Gambling contracts are void; and all evidences of debt, except negotiable instruments in the hands of holders in due course or encumbrances or liens on property, executed upon a gambling consideration, are void in the hands of any person.

(b) Money paid or property delivered upon a gambling consideration may be recovered from the winner by the loser by institution of an action for the same within six months after the loss and, after the expiration of that time, by institution of an action by any person, at any time within four years, for the joint use of himself and the educational fund of the county.

71.    Therefore, all of Defendants' gambling operations, agreements, and funds it has received from Plaintiff and the Class are void and subject to refund or return to Plaintiff and the Class in order to reimburse Plaintiff and the Class for their losses during the preceding six months.

72.    Plaintiff and the Class are authorized to proceed with litigation against Defendants to

recover all losses that Plaintiff and the Class may have incurred from utilizing the Defendants

gaming sites during the preceding six months.

73.    Plaintiff, individually, as "any person", is authorized to proceed with litigation against

Defendants to recover all losses that Plaintiff and the Class may have incurred from utilizing the

Defendants gaming sites over the past four years, excluding the six months preceding the filing

of this Complaint.

74.    Therefore, Plaintiff and the Class are recognized and entitled by Georgia law to the return

of all gambling or gaming losses suffered by Plaintiff and the Class because any such gambling

agreements are void.

76.    Section 13-8-3 authorizes the Plaintiff to obtain a judgment on behalf of Plaintiff and the

Class separate from the interest of the state and state attorney.

77.    Defendants' casino games constitute an internet gambling operation because the players,

and in particular Plaintiff and the Class members have tendered coins by purchase of GC and SC,

and then wagering the coins.  By an element of chance (e.g., spinning a virtual slot machine,

choosing numbers on a roulette table, or playing blackjack) Defendants create a right to credits

and or other things of value such as SC that can be redeemed for money.

78.    Plaintiff and the Class suffered losses or damages from gambling operations conducted

by Defendants when Plaintiff and the Class purchased coins or expended money to obtain coins

(GC and SC) to wager at Defendants' games.  Plaintiff and each member of the Class staked

money in the form of coins purchased with money or acquired by expenditures of money, in

order to play Defendants' games of chance (Defendants slot machines, roulette and blackjack

within Defendants) for the chance of winning additional things of value (e.g., coins that grant

additional free plays or coins (SC) that can be redeemed for prizes or cash)

79.    The "Gold Coins" (GC) Plaintiff and the Class have had the chance of winning in

Defendants' virtual casino games are things of value under Georgia law because the GC are

credits that allow for the extension of entertainment and the privilege of continuing to play the

games without additional charge.

80.    The "Sweeps Coins" (SC) Plaintiff and the Class had the chance of winning in

Defendants' virtual casino games are things of value under Georgia law because they can be

redeemed for cash payments.

81.    As a direct and proximate result from Defendants operations of their games and virtual

casino, Plaintiff and each member of the Class have lost money wagering at Defendants games

of chance.

WHEREFORE, Plaintiff, on behalf of himself and the Class seek an order:

(1) requiring Defendants to cease operations of their gambling devices and operations;

and or

(2) awarding Plaintiff and the Class all lost monies, interest and reasonable attorney's

fees, expenses, and cost to the extent allowable.

(3) removing, disqualifying, disallowing, or rejecting entries onto Defendants' websites

and gaming forums;

(4) against Defendants for failing to award prizes offered; and

(5) allowing the printing, publishing, or circulating literature or advertising

materials about the websites or game promotions which are false, deceptive, or

misleading;

John Doe Complaint                               26

## <u>ADDITIONAL PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff individually and on behalf of all other similar situated Class members seek judgment against Defendants as follows:

A.    For an order certifying this action as a class action, appointing Plaintiff as class representative and appointing Plaintiff's counsel as Class Counsel;

B.    For compensatory damages on all applicable claims and in an amount to be proven at trial;

C.    For restitution on all applicable claims in an amount to be proven at trial;

D.    For an order requiring Defendants to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

E.    For an order enjoining the wrongful conduct alleged herein;

F.    For other appropriate injunctive and equitable relief;

G.    For costs;

H.    For pre-judgment and post-judgment interest as provided by law;

I.    For attorney's fees under the account contracts the common fund doctrine and all other applicable rules of law; and,

J.    For other relief as the court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of any and all issues in this action so triable by Georgia law.

Dated this ___7TH___ day of June 2023

Respectfully submitted,

Barry Williams
PO Box 1483
Villa Rica, Georgia 30180
Georgia Bar No. 538108
Email: advocatedib@gmail.com
Attorney for Plaintiff
JOHN DOE